NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0393n.06

Case No. 24-1094

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JAMES BLEDSOE, PAUL CHOUFFET; MARTIN RIVAS; ALAN STRANGE; DAWN ROBERTS; JAMES FORSHAW; MATT LANGWORTHY; MARTY WARD; MARC GANZ; MICHAEL ERBEN; JORDAN HOUGO; MARTIN WITBERG; NATALIE BEIGHT; DONOVAN KERBER; JEREMEY PERDUE; individually and on behalf of all others similarly situated | ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Plaintiffs-Appellants, | ) ) | OPINION |
| v. | ) ) | |
| FCA US, LLC; CUMMINS, INC. | ) ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Plaintiffs are a group of consumers who purchased and drove Dodge Ram 2500 and 3500 pickup trucks manufactured by FCA US, LLC, and equipped with diesel engines produced by Cummins, Inc. (FCA stands for Fiat Chrysler Automobiles.) Plaintiffs claim they purchased their trucks due to FCA's and Cummins's advertisements touting the vehicles as more fuel efficient and environmentally friendly than other diesel trucks on the market. Despite these assurances, plaintiffs allege, defendants knew that their trucks emitted more pollutants than legally permitted, that real-world driving conditions reduced the effectiveness of the trucks' emissions control systems, and that the trucks' fuel economy similarly underperformed

in real-world conditions. So plaintiffs filed suit, asserting various state law fraud causes of action as well as claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In a series of rulings, the district court ultimately sided with defendants, and granted judgment in their favor.

It is no understatement to say that we do not write on a clean slate. Three of our recent decisions deeply inform today's analysis. *See In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851 (6th Cir. 2023); *Fenner v. Gen. Motors, LLC*, 113 F.4th 585 (6th Cir. 2024); *Counts v. Gen. Motors, LLC*, 139 F.4th 576 (6th Cir. 2025). With this precedential backdrop in mind, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

A. The key question in this case is whether federal law preempts plaintiffs' state law claims. To reach an answer, we begin by describing the relevant federal scheme, which largely centers on the Clean Air Act, 42 U.S.C. §§ 7401–7671. The Act is particularly relevant here because it subjects the Dodge Ram (like all vehicles in the U.S. market) to extensive government regulation and testing prior to sale. *See, e.g.*, *id.* § 7525.

In the Act, Congress authorized the Environmental Protection Agency to develop, police, and enforce motor vehicle emissions standards. *Id.* This authority includes the ability to prescribe standards for the emission of dangerous pollutants from new motor vehicles or engines. *Id.* § 7521(a)(1). Congress also empowered the EPA to create tests for policing compliance with its standards, to inspect manufacturers' testing processes, and to impose penalties for noncompliance. *Id.* § 7525.

To ensure that a vehicle sold in the United States complies with such standards, the manufacturer must first obtain a certificate of conformity from the EPA. *Id.* The EPA may issue this certificate "only if [it] determines that the manufacturer . . . has established to the [agency's] satisfaction" that any "emission control device, system, or element of design" in or on the "vehicle or engine conforms to applicable [federal regulations]." *Id.* § 7525(a)(3)(A). As part of this process, EPA regulations require manufacturers to disclose whether a vehicle has any "auxiliary emission control devices" (or AECDs). *See* 40 C.F.R § 86.1844-01(d)(11). An AECD is "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." *Id.* § 86.1803-01.

Not all AECDs are permissible. An AECD is deemed an impermissible "defeat device" if it unjustifiably "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." *Id.* § 86.004-2 (citation modified). In simpler terms, a defeat device, as its name suggests, defeats the proper functioning of an emissions control system. If a vehicle is equipped with such a device, the EPA may not issue a certificate of conformity. *Id.* § 86.1844-01(g)(5). Thus, a manufacturer's disclosures must provide "a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system" and a "rationale for why it is not a defeat device." *Id.* § 86.1844-01(d)(11).

B. In 2006, Cummins, in conjunction with FCA, commenced the regulatory process for Dodge Ram trucks' engines. Relevant to that review process was the EPA's forward-looking "2010 NOx standard," which required a 95 percent reduction in NOx emissions from heavy-duty diesel engines by 2010. *See* Control of Air Pollution from New Motor Vehicles, 66 Fed. Reg.

3

5002, 5005 (Jan. 18, 2001) (to be codified at 40 C.F.R. pts. 69, 80, 86). ("NOx" refers to the "oxides of nitrogen"—that is, compounds formed from oxygen and nitrogen—which have various negative "health and welfare effects." *Id.* at 5005–06.) To meet this standard, Cummins (along with FCA) developed the 6.7-liter adsorber and Turbo Diesel engine. The engine included two emissions control features: a diesel particulate filter, which traps and removes particulate (soot) emissions, and an NOx adsorber catalyst system, which facilitates the capture and reduction of NOx into less harmful substances, such as nitrogen and oxygen.

In seeking an emissions certification, Cummins explained to the EPA how it calculated the levels of NOx the engine emitted and, in addition, justified the existence of the vehicles' AECDs. After the EPA conducted additional testing, it issued Cummins a certificate of conformity. Once Cummins obtained the certificate, FCA began selling Dodge Ram trucks equipped with the engine. It marketed the vehicle as equipped with the "strongest, cleanest, quietest" diesel engine in its class, "squeaky clean," and a "model of cleanliness." Third Am. Compl., R. 255, PageID 34993. FCA also touted the newly engineered trucks as "maintain[ing] [their] fuel efficiency" and achieving "30 percent fuel economy savings over gasoline engines." *Id.* at PageID 35066.

According to plaintiffs, those representations were false. Plaintiffs claim that their own testing revealed that the trucks contained at least two designed software features that derate or turn down the emissions controls outside the test environment. Yet plaintiffs allege that FCA and Cummins never told consumers that the emission control system was "limited during normal driving conditions" so that the vehicles emitted more NOx and had worse fuel economy in real-world driving conditions than they did in the EPA testing environment. *Id.* at PageID 35162.

So, in 2016, plaintiffs filed suit against FCA and Cummins, asserting various state law fraud-based causes of action, as well as claims under RICO. Plaintiffs' complaint alleged that

FCA and Cummins fraudulently misrepresented or failed to disclose that, in normal operating conditions, the software devices in the engine led to NOx emissions higher than the levels in five relevant categories: (1) comparable gasoline trucks, (2) reasonable consumer expectations, (3) advertised by FCA and Cummins, (4) allowed under EPA and state emission standards, or (5) allowed to obtain a certificate of conformity. Plaintiffs also alleged that FCA and Cummins misrepresented and failed to disclose that this same engine software "dramatically reduce[d] fuel economy" in normal driving conditions contrary to plaintiffs' expectations of "high fuel economy" throughout the life of their trucks. *Id.* at PageID 35051, 35004.

C. In the years that followed, the case developed a rather complex procedural history. After conducting discovery under plaintiffs' second amended complaint, FCA and Cummins moved for summary judgment in April 2022. Defendants argued that the Clean Air Act preempted plaintiffs' state law claims and that plaintiffs lacked standing to bring their RICO claims. In July 2022, while those motions were pending, plaintiffs filed their now-operative third amended complaint, adding a single new plaintiff, against whom FCA subsequently moved for summary judgment as well, largely on the same bases as before.

The district court granted defendants' motions with respect to plaintiffs' RICO claims, concluding that plaintiffs lacked standing under the indirect-purchaser rule. But it denied those motions as to a host of state law claims. The district court held that those claims hinged on whether defendants were aware that the "clean diesel" engines did not function as advertised, and thus did not depend on proving a violation of the Clean Air Act, which would have raised preemption concerns. Order Den. and Granting Defs.' Mots. Summ. J., R. 272, PageID 37754. Even as to the surviving state claims, however, the court narrowed the factual bases on which plaintiffs could seek to prove their case. Specifically, it excluded as speculative and unreliable plaintiffs' expert

evidence that the software functions were "defeat devices" and, accordingly, granted summary judgment on any claims "premised on" the "inadmissible defeat device theories." *Id.* at PageID 37716.

At this point, we issued the first in a series of decisions that largely direct today's resolution: *In re Ford Motor Co. F-150 & Ranger Truck Fuel Economy Marketing & Sales Practices Litigation*, 65 F.4th 851 (6th Cir. 2023). The plaintiffs in *Ford* similarly brought state law fraud claims, alleging that the gas mileage of F-150 and Ranger pickup trucks was worse than advertised. *Id.* at 858. Ford advertised the trucks by citing the EPA mileage estimates—estimates that the EPA approved based on testing data Ford submitted to the agency. *Id.* at 857. We held that the plaintiffs' claims, which were based on a fraud-on-the-agency theory, were preempted because they "inescapably and impermissibly put[] a jury into the EPA's regulatory shoes," as the plaintiffs' claims "essentially challenge[d] the EPA's [gas-mileage] figures" for the vehicles. *Id.* at 863. Problematic there was the fact that "even though the EPA exercised its statutory duty and found Ford's testing to be acceptable, a jury would still make its own determination" about whether the EPA's figures were correct. *Id.* "[A]llowing juries to second-guess the EPA's fuel economy figures would permit them to rebalance the EPA's objectives," thereby "disrupt[ing] the expert balancing underlying the federal scheme." *Id.* (quotation omitted).

Invoking this new precedent, FCA and Cummins moved for judgment on the pleadings as to all remaining claims, arguing that *Ford* mandated their dismissal on preemption grounds. *See* Fed. R. Civ. P. 12(c) (allowing motion for judgment on the pleadings at any time "after the pleadings are closed—but early enough not to delay trial" (citation modified)). The district court agreed, holding that the Clean Air Act implicitly preempted plaintiffs' residual state law claims. To succeed on their remaining claims, the court explained, "plaintiffs must demonstrate in some

measure that defendants failed to follow the EPA-prescribed testing procedures or their obligation to report truthful information to the EPA." Order Granting Defs.' Mot. J. Pleadings, R. 293, PageID 41865 (citation modified). It entered its final judgment on the same day.

Plaintiffs appealed. (Some plaintiffs, however, are not parties to this appeal because their counsel withdrew before the notice of appeal was filed and thus did not sign it on their clients' behalf. *See* Fed. R. App. P. 32(d); *NLG, LLC v. Horizon Hosp. Grp., LLC (In re Hazan)*, 10 F.4th 1244, 1254 n.8 (11th Cir. 2021). Before us, they challenge both the judgment on the pleadings entered against them on their state law claims as well as the previous grant of summary judgment as to their RICO claims.

II.

Begin with the claims resolved on preemption grounds. We review decisions granting a Rule 12(c) judgment on the pleadings with fresh eyes, using the same standard we apply to Rule 12(b)(6) dismissals. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). To survive, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified).

Federal law, the Supremacy Clause tells us, is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. In honor of this command, we will not enforce a state law that either expressly or implicitly conflicts with federal law. *McDaniel v. Upsher-Smith Lab'ys, Inc.*, 893 F.3d 941, 944 (6th Cir. 2018). Relevant here is one form of implied preemption, known as conflict preemption: a state law is preempted on conflict grounds if it makes compliance with federal law "impossible" or if the state law is "an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

Instructive to our application of that principle today is an another of our recent cases, this one addressing similar auto-emissions-based claims: *Fenner v. General Motors, LLC*, 113 F.4th 585 (6th Cir. 2024). *Fenner* likewise involved state law consumer protection claims, in that case against General Motors, alleging that GM trucks equipped with Duramax diesel engines contained defeat devices that made the trucks emit more NOx than consumers expected. *Id.* at 591. The theories there mirror the ones here: that the trucks emitted levels of NOx many times higher than "(i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the [EPA]'s maximum standards, and (v) the levels set for the vehicles to obtain a certificate of compliance." *Id.* at 596 (citation modified).

A divided panel held that the Clean Air Act did not displace the first three of those theories. *Id.* at 596–97. That was so because they did "not depend" on either the existence of a defeat device or "any fraud in the emissions-testing process." *Id.* at 599 (citation modified). Rather, the plaintiffs' evidence rooted those theories in what GM had marketed to consumers, not what it told the EPA during the certification process. *Id.* By contrast, the remaining two theories were categorically preempted. *Id.* at 596. Those claims, the majority opinion explained, "would require a showing that, contrary to the EPA's decision, the Duramax Trucks failed to meet EPA standards." *Id.* In other words, the claims depended on a showing of fraud on the agency, which *Ford* held was preempted by federal law. *Id.*

*Emissions-based claims.* Turn now to the case at hand, starting with plaintiffs' claims tied to the vehicles' emissions levels. Beginning with plaintiffs' last two theories—that the trucks emit more NOx than that allowed to satisfy the EPA standard or to obtain a certificate of conformity— *Fenner* makes clear these claims are preempted. *Id.* At bottom, succeeding on those theories requires a showing that FCA and Cummins defrauded the EPA. *See id.*; *Ford*, 65 F.4th at 866–

67. The claims thus present "impermissible legal challenges to the EPA's decision" to certify the trucks. *Fenner*, 113 F.4th at 596 (quoting *Ford*, 65 F.4th at 863).

But plaintiffs' remaining theories—that FCA and Cummins misled and defrauded consumers because the trucks emitted NOx at a rate higher than (1) emitted by comparable gasoline trucks, (2) expected by a reasonable consumer, or (3) as advertised by defendants—at least plausibly allege a baseline consumer expectation independent of compliance with federal emissions standards. *See* Third Am. Compl., R. 255, PageID 35162 (reciting theories). As in *Fenner*, attempting to prove fraud on these grounds poses no inherent "challenge [to] the EPA's determinations." *Fenner*, 113 F.4th at 596. Rather, "these theories of liability are based on [FCA's and Cummins's] statements and omissions to the public." *Id.* at 602. And plaintiffs identify "benchmark[s]" here that plausibly "exist independently of federal regulation"—namely, by comparing emissions to gasoline vehicles, reasonable consumer expectations, and advertised levels. *Id.* At least for purposes of the pleading stage, plaintiffs have done enough to allege that their "state law claims are not based on a violation of [federal] emissions standards." Third Am. Compl., R. 255, PageID 35000.

FCA and Cummins counter that we need not follow *Fenner* because it improperly overruled *Ford*. *See, e.g.*, Supp. Br. Appellee FCA 10; *see also United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) ("One panel of this court may not overrule the decision of another panel . . . ."). That argument turns our attention to yet another recent decision from our Court: *Counts v. General Motors, LLC*, 139 F.4th 576 (6th Cir. 2025). As we acknowledged there in rejecting a similar argument, defendants' characterization of *Fenner* "is an overstatement." *Id.* at 582. Many have asked whether *Fenner* properly applied *Ford*. *See Fenner v. Gen. Motors, LLC*, 121 F.4th 1117, 1120 (6th Cir. 2024) (order) (Griffin, J., dissenting from the denial of the petition

for rehearing en banc); *id.* at 1121 (Kethledge, J., dissenting from the denial of rehearing en banc). But disagreement on how one precedent interprets another is not grounds to ignore published precedent. *See Counts*, 139 F.4th at 582. At day's end, *Fenner* remains binding on this panel. *Id.*

FCA and Cummins next argue that, even accepting *Fenner* as binding, plaintiffs' remaining state law claims are still preempted because, in substance, at least, they rely on proof of a violation of federal standards or fraud on the EPA. To bolster this point, defendants note that the complaint is rife with comparison of the trucks' performance to EPA standards. For example, plaintiffs allege that in "stop-and-go driving" conditions, the truck's "average emissions" were "4.4 times the legal standard" and the engine performed a pollution-increasing process called "active regeneration" at "ten times the frequency allowed in the federal emissions test." Third Am. Compl. R.255, PageID 34994. Based on these ubiquitous references, defendants argue that consumers' understanding of the trucks as "clean" meant only that they expected the trucks to comply with EPA standards. In their view, it follows, for plaintiffs to prove that they were misled as to their reasonable expectations, they must necessarily prove the trucks' noncompliance with EPA standards, a theory barred by *Ford. See Ford*, 65 F.4th at 866–67; *Fenner*, 113 F.4th at 596.

But at this pleading stage, the complaint need only allege a plausible basis for relief. And here, plaintiffs have at least alleged baselines that are plausibly independent from EPA regulations—consumer expectations, gasoline vehicles, and manufacturer advertisements. *See* Third Am. Compl., R. 255, PageID 35162. And it was these exact theories in *Fenner* that we eventually determined did not depend on plaintiffs proving non-compliance with federal regulation. At the same time, *Counts* makes clear that *Fenner* did not simply rubber stamp any claim that facially identifies an alleged alternative baseline. *Counts*, 139 F.4th at 582–83. Rather, the *Fenner* plaintiffs survived summary judgment because they presented concrete, competent

10

evidence of consumer expectations that "exist[ed] independently" of EPA standards. *See Fenner*, 113 F.4th at 596–97 (discussing deposition testimony showing that consumers expected "lower emissions than other vehicles on the market").

The same may not be true in every case. *See Counts*, 139 F.4th at 582. It is thus incumbent upon the district court, as these claims proceed beyond the pleadings, to determine whether plaintiffs "can prevail without showing that the subject vehicles violate EPA regulations." *Fenner*, 113 F.4th at 598 (quotation omitted). For that to be the case, as we recently explained, "no part of [a claim's] syllogism can implicate or challenge a determination of the EPA." *Counts*, 139 F.4th at 582 (citation modified). Equally so, "the evidence in support of the claim must exist independently of EPA standards. Only if both of those things are true are the claims not preempted." *Id*. (citation modified). But, at least at the pleadings stage, plaintiffs have done enough to allege that an independent baseline exists. *Compare* Third Am. Compl., R. 255, PageID 35162 (alleging that the "[v]ehicles emitted far more pollutants than gasoline-powered vehicles . . . [and] than a reasonable consumer would expect in light of the Defendants' advertising campaign"), *with Fenner*, 113 F.4th at 592 (reciting that the complaint alleged that the trucks "emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised").

*Fuel economy-based claims.* We take up next plaintiffs' claims tied to purportedly false fuel economy figures utilized by defendants. According to plaintiffs, defendants misrepresented and omitted truthful information regarding the truck's reduced fuel economy, which led consumers to believe the truck was more fuel efficient in real-world driving conditions than advertised.

Some background helps set the stage. The Energy Policy and Conservation Act Amendments of 1994 require "manufacturers of automobiles" to provide consumers with a label

containing EPA-calculated data about the automobile's fuel economy. *See* 49 U.S.C. §§ 32908(b)(1)(A), 32904(c). This labeling requirement, however, does not apply to vehicles with a gross weight rating of more than 8,500 pounds, as they do not fall under the statute's definition of "automobiles." *Id.* §§ 32908(a)(1), (b)(1)(A). And all trucks at issue here, it bears noting, are over 8,500 pounds, and therefore exempt from the EPA-calculated fuel economy figure disclosure rule.

Now turn to plaintiffs' misrepresentation claims. Plaintiffs allege that FCA touted its newly equipped trucks' "improvements in fuel economy" and promised "30 percent fuel economy savings over gasoline engines." Third Am. Compl., R. 255, PageID 35066, 35125. Despite these assurances, plaintiffs say, real-world driving conditions reduced fuel economy.

At first glance, these claims resemble those held preempted in *Ford.* There, the plaintiffs alleged that Ford misled and defrauded consumers when it advertised its vehicles as having "best-in-class EPA-estimated highway fuel efficiency rating of 30 mpg." 65 F.4th at 866. But critical differences remain. For one, the fuel efficiency disclosures at issue there were mandated by federal law. *Id.* For another, the EPA calculated and tested the fuel economy figure Ford used in its advertisements. *Id.* at 855–57; *see* 49 U.S.C. § 32904(c). Because the "EPA accepted Ford's testing information and published its estimate based on that information, plaintiffs' claims essentially challenge[d] the EPA's figures." *Ford*, 65 F.4th at 863. Accordingly, *Ford* concluded those claims too were preempted. Even framed as fraud-on-consumers through advertisements, those claims presented an impermissible legal challenge to the EPA's decision to approve the truck's fuel economy figure. *Id.* at 867.

Unlike *Ford*, however, plaintiffs' success here, at least based on the pleadings, does not turn on a challenge to EPA-approved figures. That is so because FCA was not legally required to

inform consumers of its vehicles' fuel economy figures; in fact, it was explicitly exempt. *See* 49 U.S.C. § 32908(a)(1), (b)(1)(A). Therefore, any representations made regarding the truck's fuel economy concern only what FCA told consumers—not any EPA-issued or -tested figures. *Cf. Fenner*, 113 F.4th at 597. In short, FCA was "responsible for the contents of" the advertisements about fuel economy "and could alter [them] unilaterally without agency approval." *Ford*, 65 F.4th at 866. Because plaintiffs' theory here is premised on what FCA marketed to consumers and not on disclosures it made to the EPA, it is not preempted. *See Fenner*, 113 F.4th at 598.

So too for plaintiffs' omissions-based claims. The theory underlying those claims is that defendants had an independent state law duty to disclose their fuel economy estimates. As defendants' disclosures were not required by federal law, the theory goes, they are not preempted. *See Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 586–87 (6th Cir. 2013) ("[The plaintiff's] suit is not even *premised* on violation of federal law, but rather on an independent state duty. . . . This is simply not grounds for preemption." (emphasis in original)). Instructive here is *Wyeth v. Levine*, 555 U.S. 555 (2009). There, the plaintiff alleged that a drug label was inadequate because it failed to warn against the dangers associated with a particular method of administration. *Id.* at 558–59. Emphasizing that the FDA had approved the label, the drug's manufacturer argued that the FDA's labeling regulations preempted a state law failure-to-warn claim. The Supreme Court disagreed. *Id.* at 573. Because the private manufacturer (rather than a federal agency) had ultimate control over the content of the warning label (beyond the FDA-mandated minimum disclosures, which the state tort duty did not implicate), state law claims based on additional disclosures were not preempted. *Id.* at 570–73. The same reasoning applies here. The heavy-duty trucks at issue are not subject to any EPA-required fuel economy disclosure. Accordingly, at least as we understand the case at this stage, there is no federal law with which a state law duty to disclose fuel economy

information could conflict. Much like the drug manufacturer, FCA and Cummins can disclose their fuel economy figure without involving a federal agency, meaning a state law claim premised on this theory is not preempted.

Relying on *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), defendants counter that federal law, by exempting large trucks from fuel economy disclosure requirements, necessarily preempted state laws requiring similar disclosures. This reads *Geier* too broadly. The federal law at issue there cabined the reach of Department of Transportation safety regulations to afford car manufactures a range of choices with respect to the safety devices they utilized. *Id.* at 874–75. So a state tort claim that imposed a duty to install an airbag conflicted with the more flexible federal scheme. *Id.* But defendants point to nothing at the pleading stage that suggests a similar conflict created by the federal scheme at issue here. And the federal choice to not regulate on an issue, standing alone, does not automatically result in preemption of state regulations on that same issue. *See Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335–36 (2011); *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 283 (6th Cir. 2010).

Defendants also believe that both the omission and misrepresentation claims are preempted because, in the end, they turn on the alleged existence of a "defeat device." *See* Br. Appellee FCA 17, n.11; Br. Appellee Cummins 40–41(arguing that plaintiffs cannot challenge the trucks' fuel economy without challenging the EPA's approval of the trucks' NOx adsorber). Thus, according to defendants, these claims still turn on a finding that FCA and Cummins defrauded the EPA. *See Ford*, 65 F.4th at 865. Here too, defendants may be proven correct on this point as a factual matter. But for today's purposes, we address these claims merely at the pleading stage, not summary judgment. Whether the claims can be proven without reliance on the alleged existence of a defeat device is a matter for the district court to determine on remand. *See Counts*, 139 F.4th at 582.

*California law claims.* We briefly address plaintiffs' argument that the district court erred in dismissing plaintiffs' claims under California law. Appellant Br. 41. As relevant here, the Clean Air Act expressly waives preemption of California's emissions standards. *See* 42 U.S.C. § 7543(b)(1); *California v. EPA*, 940 F.3d 1342, 1345 (D.C. Cir. 2019). Therefore, the district court, after finding the other state claims preempted, performed a separate analysis of whether the California claims should be treated differently—and found they should not. As in *Fenner*, because plaintiffs' state law claims are not preempted, we need not resolve this issue. *Fenner*, 113 F.4th at 603 ("Because we hold that Plaintiffs' state-law claims are not preempted by the CAA, we need not analyze California state-law claims standing alone.").

\*　　\*　　\*

On these preemption issues, it bears repeating that there remains work to do in the district court. After all, while today's opinion answers some preemption-related questions, it at the same time raises others, consistent with our opinions in *Ford*, *Fenner*, and *Counts*. And with two of those decisions having been issued after the district court entered judgment in this case, that court deserves an opportunity to address these outstanding issues with the benefit of recent case law. *Counts*, 139 F.4th at 582 (noting that the district court, as here, "knows the record better than we do"). Thus, as in *Counts*, we "remand the case for the district court to decide whether . . . the plaintiffs' remaining claims can proceed without relying in any way on a disagreement with the EPA's determinations" and standards. *Id.* Said differently, "are [plaintiffs' remaining claims] preempted under the analysis described above[?]" *Id.* at 583.

For instance, the district court should ensure that plaintiffs' emissions-based claims "do not depend on the use (or misuse) of a defeat device, nor on any fraud in the emissions-testing process." *Id.* at 582 (citation modified); *see also id.* (emphasizing that "the term 'theories' . . .

means syllogisms in support of a particular claim" and that "for a claim based on a particular theory to avoid preemption, no part of its syllogism can 'implicate or challenge" a determination of the EPA"); *id.* (adding that "the evidence in support of the claim must exist independently of EPA standards" and that "only if both of those things are true are the claims not preempted" (citation modified)). So too for plaintiffs' fuel-economy claims. Again, the district court should examine the record to see if plaintiffs can challenge the trucks' fuel economy without challenging the EPA's approval of the trucks. We trust the district court to probe these issues and others as it sees fit, and to "otherwise engage in proceedings consistent with this opinion." *Id.* at 583; *see also id.* (explaining that "[t]o the extent any such claims are not preempted, the district court may [also] decide . . . the separate question whether the record in this case—as it now stands after the close of discovery—shows the existence of genuine issues of material fact as to any such unpreempted claim").

III.

Finally, plaintiffs challenge the grant of summary judgment to defendants on plaintiffs' RICO claims. We review the district court's decision here with fresh eyes. *Rieves v. Town of Smyrna*, 67 F.4th 856, 862 (6th Cir. 2023). On that note, the district court held that plaintiffs lack standing to bring this claim because of the indirect-purchaser rule. *See* Order Den. and Granting Defs.' Mots. Summ. J., R. 272, PageID 37749–52. "That rule developed in the antitrust context as a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers." *Counts*, 139 F.4th at 583 (citation modified). Plaintiffs claim that the rule does not apply to them because they do not seek to recover "passed-on overcharges." Appellant Br. 49. Whatever merits this argument may have in a vacuum, it is now squarely foreclosed by *Fenner*. 113 F.4th at 603–05; *Counts*, 139 F.4th at 583. In addressing a virtually identical RICO claim, *Fenner* held that the

16

indirect-purchaser rule applies even when plaintiffs do not seek to recover "pass-through charges." 113 F.4th at 604.

On this point, the tables seemingly are turned, with *plaintiffs* contending that *Fenner* conflicts with binding precedent. *See* Appellant Supp. Br. 7. As we recently held, it does not. *Counts*, 139 F.4th at 583. *Fenner* remains binding precedent on this front as well. Thus, we affirm the district court's grant of summary judgment to defendants.

*     *     *     *     *

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.